ALFRED C. GENDREAU *et al. vs.* HELEN G. RADTKE, *Admx.*

AUGUST 3, 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J.   This is an appeal to the superior court, duly taken by the eight surviving sons and daughters of Oliva C. Gendreau, late of the city of Providence in this state and hereinafter referred to as the decedent, from a decree of the probate court of that city, by which Helen G. Radtke, a daughter of a deceased son of the decedent, was appointed administratrix of the decedent's estate.  This decree was entered on, and in accordance with, a petition filed by Helen G. Radtke and her three sisters, their father having left no son.

A jury trial was claimed in the superior court by the appellants.  The reasons of appeal, as filed, were, in substance, that the decree was contrary to the law; that it was contrary to the evidence; that the appellants were sons and daughters of the decedent and objected to the appointment of the appellee as administratrix of her estate; and that there was no occasion for the appointment of an administratrix.

The case was tried before a justice of the superior court and a jury; and at the conclusion of the introduction of evidence for the appellants and evidence for the appellee, the trial justice denied a motion by the appellants that he direct the jury to return a verdict in their favor. He also granted a motion by the appellee that he direct the jury to return a verdict in her favor; and so directed the jury, who returned a verdict accordingly.

The case is now before us on a bill of exceptions filed by the appellants, the only exceptions therein set forth and relied upon before us being to the denial of the former of these motions and the granting of the latter of them. The following facts were established by the evidence:

The decedent, who died intestate on July 21, 1940, was the widow of Godfrey L. Gendreau, who was the father of her nine sons and daughters and who had died June 8, 1936, leaving a will by which he gave all his property to her. On May 28, 1936, when he was apparently in good health, a family gathering took place at his home, and nearly all his children were present. The appellee's father had previously died and Arthur Gendreau, the second son, who was blind, was not invited and was not present.

At this gathering were executed many typewritten instruments which had been prepared by an attorney, who was then the attorney for Godfrey Gendreau and his wife, and was the attorney for her until her death, and thereafter for the appellants. Certain of these instruments were deeds by which Godfrey Gendreau and his wife conveyed all their respective parcels of real estate, the total value of which was a good many thousands of dollars, to their sons and daughters who were present. These deeds were delivered to the grantees at this gathering.

Others of the instruments then executed, acknowledged and delivered were mortgages to Godfrey Gendreau and his wife and to the survivor of them, by the respective grantees under the above-described deeds and covering these properties and securing promissory notes by these grantees for the

full values of the properties conveyed to them respectively. Still others of the instruments then executed by Godfrey Gendreau and his wife were releases and discharges of all but one of the mortgages then executed and also a receipt for one half of the amount secured by each of the same mortgages. All of these releases and discharges and receipts were left undated and were delivered to and retained by the above-mentioned attorney.

The instructions to him were that he was to deliver these receipts to the respective mortgagors upon the death of the one first dying of Godfrey Gendreau and his wife; and they were so delivered by him on the death of the former. Apparently, according to instructions given to him at the time of the meeting, the releases and discharges of the mortgages were delivered by him soon after the death of the decedent; and they bear the date of July 30, 1940, the last day before her death. Until that time interest on the mortgage notes had been regularly paid to her after her husband's death.

The mortgage above referred to, as not included in those of which releases and discharges were executed at the family gathering, was a first mortgage made to Godfrey Gendreau by Yvonne Richard, one of his daughters, and Alfred, Alvin and Albert Gendreau, three of his sons, and securing a note to him for $3000. This note was then indorsed by him to Arthur Gendreau, his only other living son, to whom he also executed a transfer of the mortgage. This mortgage, the indorsed note and the transfer were, soon after the death of Godfrey Gendreau, delivered by other members of the family to Arthur Gendreau, to whom no real estate had been conveyed by his father or mother.

The mortgagors in that mortgage also executed and delivered at the family gathering a second mortgage on the same property to Godfrey Gendreau and his wife and to the survivor of them for $7500. These mortgagees then executed a release and discharge of that second mortgage and also a receipt for half of the sum secured thereby, thus treating it in the same way as they treated all the other mortgages re-

ceived by them at the family gathering, except the first mortgage which was transferred to Arthur Gendreau, as above stated.

No real estate was ever conveyed by either of them to Florence Gendreau, whose husband, their son Roderick, had died in 1920, or to any of his children. She had, some time after his death, brought a suit against his father to recover for an interest which she claimed that her husband had, at his death, in the laundry business owned and operated by his father and him and some other members of the family; and this suit had been settled by the payment of a small sum to her.

Later her health became poor and she was in need of money for the support of herself and children; and her father-in-law loaned her small sums from time to time, amounting finally to a little over $900, for which in 1931 she gave him a mortgage on some real estate which she owned. This mortgage and the note secured by it were discharged by him on June 3, 1936.

Not long after his death she became very ill and was almost helpless for several years, during which time his widow, the decedent, came to see her a number of times, always accompanied by one or more of her daughters, and expressed great sympathy for her.

Upon her husband's death the decedent received under his will a considerable amount of personal property consisting mainly of savings bank accounts and shares in the Morris Plan Bank. In the summer of 1936 she made a gift of $500 or thereabouts to each of her children; and in 1939 she gave each of them $1000. A short time before her death she gave and delivered all her jewelry, furs and other personal belongings to her youngest daughter, Ida Laporte, according to the latter's testimony. This witness, the youngest daughter of the decedent, also testified that she always lived with her mother until the latter's death; that her father, at the time of his death, gave her the big safe and that she had always

kept it, though her mother had the key to the locked compartments in it.

She then testified as follows: "Q. Those bankbooks were kept in that same compartment all during her lifetime? A. Yes. Q. You are sure of that? A. Surely, until she gave them over. Q. When did she give them over? A. In March, 1940. Q. Then what was done? A. Well, naturally the ones that had bankbooks, she delivered to them, and they took them and kept them. Q. They were taken outside of the safe? A. No. She left them in the safe. Q. Were they in the same compartment they always had been kept in after March 28? A. Yes. Q. Who had the keys to that compartment? A. To tell you the truth, the safe was never locked. The safe was always unlocked. Q. How about that compartment, who had the keys? A. They stood on the safe. Q. The keys were kept in the safe? A. Yes. Q. In the lock? A. In the lock. Q. How long was that true, how long was that practice continued of keeping them in the door? A. Until now. They are always there."

As to bank accounts being given to her, she testified that her mother in March, 1940, gave her two, aggregating about $10,000; and said, at the same time, that she was giving bank accounts to Alfred.

On cross- examination she testified that her father's wishes were always law to her mother and that to a large extent the same thing applied, as to her mother, with this witness and her brother Alfred after their father's death.

This brother Alfred, who was never married, testified that he received, after his father's death, gifts from his mother, $1000 once about the first of 1937, and $500 afterwards; and that in March, 1940 he received from her about $10,000 in bankbooks. He said that he had access to them and had them in his possession before she gave them to him, though he did not have the combination to the safe where they were kept. He testified also that when she wanted money, he would get the combination from her and open the safe, which belonged to Mrs. Laporte after their father's death; that January 21,

1939 was the last time when his mother drew from a bank and that she handed the books over to him as a gift in the beginning of March, 1940.

The five bankbooks representing the accounts which he testified were thus given to him and which were in different banks were filed as exhibits in the case. They show that from some of the accounts very small amounts, representing increments of interest or dividends, were drawn out during the period from March to July, inclusive, in 1940, but that no other withdrawal from any of these accounts was made during that period and that all these accounts were closed by withdrawals in August, 1940.

The books show that drawing the interest or dividend from each of these accounts, soon after it was credited, and drawing no part of the principal, was a practice followed by the decedent, with very few exceptions, during the period from her husband's death until March 1, 1940, a period during which she admittedly exercised sole control over all the accounts. The books show also that withdrawals from all these accounts were so made and limited, from March, 1940, until her death and that promptly afterwards the accounts were all closed by her son Alfred.

Alfred Gendreau further testified that he had always lived with his mother and that after his father's death they both always lived with Mrs. Laporte; that he was his mother's constant companion and therefore advised her as to her business affairs more than any other of her children.

The blind son Arthur testified that after his father's death his mother did not come to see him often and that when she did come she was always accompanied by two or three of his brothers or sisters and that he was never alone with her. He testified also that, when his father died, he was told by his brothers and sisters that he was getting $3000, evidently referring to the mortgage transferred to him by his father, as above stated; but that he never got anything from his father's estate; that his mother told him that she would fix everything for him and not to make any trouble; but that he

heard nothing afterwards; and that he received from her, after his father's death, one gift of $1000 and another of $500 and also a suit of clothes and nothing more.

He further testified that she made her home with his sister Ida Laporte and that that sister and his sister-in-law, Nora, who was the wife of his brother Alvin, knew most about his mother's business.

Helen L. Radtke, the appellee, testified that after her grandfather's death the relations between her mother and grandmother were very friendly, the latter coming to see the former once a week or once in two weeks and giving her money; but that her grandmother was always accompanied by at least one of her children.

The appellee also testified that she claimed that the mortgage discharges, delivered after her grandmother's death, though dated as of the last day before that event, and also the receipts, for one half of the amount of each mortgage note, which were signed by her grandfather when the mortgages were executed but were not delivered until soon after his death, were all illegal and void and that she had been so advised by her attorney. She further testified that she claimed that any gifts of bankbooks, fur coats, diamonds and other gifts that may have been made were also illegal; and that she knew that her grandmother "was surrounded by these people and that she was greatly influenced by them and that they had complete submission of her mind."

On the other side Ida Laporte testified that Helen Radtke and her sisters showed very little interest in their grandmother and did not come to see her after the death of their grandfather.

As the decedent here was a legal resident of the city of Providence the matter of the appointment of an administrator of her estate by the probate court of that city is governed by the first clause of G. L. 1938, chap. 569, § 3, as follows: "The probate court of any town or city shall take the probate of wills and grant administration on the estates

of deceased persons who, at the time of their decease, were inhabitants of or residents in such town or city."

To us it appears to be well settled law that under such a statutory provision it is not necessary to *prove,* as a prerequisite to the appointment of an administrator of the estate of a resident decedent, that he or she, at the time of death, left assets to be administered; but that the following rule of law, as stated in 21 Am. Jur. 395, § 40, applies: "The prerequisite of estate or assets upon which jurisdiction to appoint an administrator is conditioned may be satisfied by a claim of estate irrespective of its probable merits. A prima facie showing that there is an estate, or a bona fide claim that the deceased left property to be administered, is all that is necessary to authorize the granting of letters of administration . . . and a claim that a transfer of property from a decedent was procured through fraud and undue influence has been held sufficient assets upon which appointment of domiciliary administrators may be based."

A similar rule is stated in 2 Woerner, American Law of Administration (3d ed.) 663. As supporting the rule above quoted see *Estate of Barlass,* 143 Wis. 497, where a petitioner sought the appointment of an administrator of the estate of a resident decedent on the ground that certain instruments which, if valid, would have deprived the decedent of all property were procured by fraud and undue influence. The supreme court held as follows: "In a case like the one at bar a *bona fide* claim that there is an estate to administer will support the granting of letters and the court should not proceed to adjudge the validity of the claim. That must be left for future litigation in the proper forum and between the proper parties." See also *In re Acken's Estate,* 144 Iowa 519.

The appellants seem to rely greatly on the cases of *Estes* v. *Howland,* 15 R. I. 127, and *Gardner* v. *Gardner,* 17 R. I. 751, as showing that an administrator cannot impeach on the ground of fraud the intestate's conveyances of property. But an examination of the former of these cases shows that the

rule laid down therein related solely to conveyances alleged to have been made in fraud of *creditors,* which the man who made them could not himself have impeached on that ground. We cannot see that it is pertinent to the problem in the case now before us. As to the latter of these two cases we do not find that it throws any light on this problem. It seems clear to us that in the instant case, if the appellee is duly qualified as administratrix, there is nothing to prevent her from bringing proceedings to test the validity of the transactions now claimed by her to have been invalid.

As to the alleged gifts of so-called joint bank accounts by the decedent to her son Alfred and her daughter Ida, it seems to be well settled, according to recent cases decided by us, that a suit may properly be brought by an executor or administrator to set aside alleged *inter vivos* gifts of such accounts; and the nature of the evidence required to prove such gifts is discussed in those cases. *McCartin* v. *Devine,* 66 R. I. 100, 17 A. 2d. 864; *Millman* v. *Streeter,* 67 R. I. 218, 19 A. 2d. 254. See also *People's Savings Bank* v. *Rynn,* 57 R. I. 411.

Upon consideration of .the evidence in the instant case on the subject of the joint bank accounts here involved, we are of the opinion that it is such as to raise a real question as to their validity. Therefore, under the law above stated on that subject, we are of the opinion that the appellee, as one of the next of kin of the decedent, was clearly entitled to have an administrator appointed of the estate of the decedent, in order that such question could be decided in a proper proceeding brought by such administrator.

We are also of the opinion that, on account of their interests in the matter of these alleged gifts of bank accounts and mortgages, it would not be proper that any of the appellants who desire to be appointed, if any appointment is to be made, should be appointed as such administrator and we see no reason why the appellee should be held to be disqualified to be thus appointed.

Because of the conclusions which we have reached on the

basis of the alleged gifts of joint bank accounts, we see no reason for considering also the question of the claimed invalidity of the alleged gifts of mortgages as a ground for sustaining the appointment of the appellee as administratrix.

On the whole matter we are of the opinion that the justice of the superior court who heard this case was fully justified in directing the jury to return a verdict for the appellee and that, therefore, the appellants' exception should be overruled.

The appellants' exception is overruled and the case is remitted to the superior court with direction to enter a decree affirming the decree of the probate court from which the appeal was taken.

*Fergus J. McOsker,* for appellants.

*Gerald W. Harrington, Bancroft Littlefield, Edwards & Angell,* for appellee.